IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NEPHROLOGY & HYPERTENSION
SPECIALISTS, LLC,

      Plaintiff,

v.

FRESENIUS MEDICAL CARE
HOLDINGS, INC.,

      Defendant.

Case No. 2:09-cv-781
JUDGE EDMUND A. SARGUS, JR.
MAGISTRATE JUDGE TERENCE P. KEMP

## OPINION AND ORDER

Plaintiff Nephrology & Hypertension Specialists, LLC ("NHS") brings this action against Defendant Fresenius Medical Care Holdings, Inc. ("Fresenius") alleging that Fresenius (1) breached a settlement agreement between the parties, (2) breached an agreement allegedly reached between the parties following the execution of the settlement agreement, and (3) tortiously interfered with Plaintiff's contracts and business relationship with Defendant's subsidiary. This matter is before the Court for consideration of Defendant's Motion to Dismiss Plaintiff's Amended Complaint. (Doc. 18.) For the reasons that follow, Defendant's Motion (Document 18) is **GRANTED IN PART** and **DENIED IN PART**.

### I. Background

Plaintiff alleges the following in its Amended Complaint. Plaintiff NHS is an Ohio limited liability company with two members: Dr. Michael L. Sobel and Dr. Sreedevi V. Reddy. NHS engages in the practice of medicine, specifically treating patients with kidney ailments. Many of NHS's patients require dialysis as part of their treatment regimen. (Am. Compl. ¶¶ 1, 4.) Defendant Fresenius owns and operates approximately 1,500 dialysis clinics throughout North America. Fresenius is a subsidiary of Fresenius Medical Care AG Co. KGaA ("FMC"), a

German partnership. (*Id.* at ¶ 5.) Until the spring of 2006, the Renal Care Group, Inc., a Delaware corporation ("RCG"), was a competitor of Fresenius. RCG had a majority ownership interest in Columbus Area Renal Alliance, LLC, a Delaware limited liability company ("CARA"). (*Id.* at ¶ 6.)

In late 2004, CARA and NHS agreed to develop and operate a dialysis clinic in Westerville, Ohio. CARA and NHS agreed that CARA would own 80% of the clinic, NHS would own 20%, and NHS would serve as the clinic's Medical Director for at least ten years. (Am. Compl. ¶ 7.) On January 1, 2005, CARA and NHS entered into an agreement (the "LLC Agreement") to form Columbus Renal Care Group, LLC ("Columbus Renal"). (*Id.* at ¶ 8, Ex. A.) Columbus Renal developed a dialysis clinic in Westerville, Ohio (the "Columbus Renal Clinic") and entered into an agreement with NHS (the "Medical Director Agreement") to retain NHS as Medical Director for at least ten years. By the spring of 2006, the Columbus Renal Clinic was ready to open, and NHS was performing its duties as the clinic's Medical Director. (*Id.* at ¶ 9, Ex. B.)

On March 31, 2006, FMC acquired RCG and thereby became the indirect owner of CARA and the indirect owner of 80% of Columbus Renal. Shortly after, Fresenius (FMC's subsidiary) succeeded to all of RCG's business, including control over Columbus Renal. (Am. Compl. ¶ 11.)

Prior to FMC's acquisition of RCG, Fresenius had organized and developed a dialysis clinic (the "Fresenius Clinic") less than one mile from the location of the Columbus Renal Clinic. If both clinics had opened and operated, they would have been direct competitors. (Am. Compl. ¶ 12.)

2

Plaintiff alleges that, after succeeding to all of RCG's business, "Fresenius intentionally and maliciously prevented CARA and Columbus Renal from opening the Columbus Renal Clinic and, thereby, prevented them from performing and caused them to repudiate and breach their agreements with NHS, including the Medical Director Agreement." (Am. Compl. ¶ 13.) Plaintiff alleges that Fresenius prevented CARA and Columbus Renal from opening the Columbus Renal Clinic in order to benefit that clinic's would-be competitor, the Fresenius Clinic. (*Id.* at ¶ 14.)

In May of 2006, Dr. Sobel, on behalf of NHS, told Philip Roeser and other representatives of Fresenius that he objected to the closure of the Columbus Renal Clinic and the consequent repudiation of the Medical Director Agreement. (Am. Compl. ¶ 15.) The parties discussed the possible settlement of NHS's claims against Fresenius. (*Id.* at ¶ 16.) On May 24, 2006, Sobel notified Roeser that NHS was agreeable to the settlement terms that had been proposed. Thereafter, NHS and Fresenius executed a Letter of Understanding dated June 22, 2006 (the "Settlement Agreement"). The Settlement Agreement provided the following:

> In return for [NHS's] not pursuing any claims against [Fresenius] and RCG regarding this Medical Directorship [of the Columbus Renal Clinic], [Fresenius] agrees as follows:
>
> 1. [Fresenius] shall pay [NHS] the sum of [$500,000].
>
> 2. [Fresenius] shall permit [NHS] to purchase, at fair market value, a 20 percent interest in the Fresenius Clinic. . . . If [NHS] wish[es] to purchase such interest, [Fresenius] shall prepare a separate letter of intent regarding the formation of a joint venture to operate the Fresenius Clinic, which operation shall be consistent with [Fresenius's] Joint Venture Policy.
>
> 3. [Fresenius] shall provide [NHS] a right of first refusal to purchase a 20 percent interest in any subsequent outpatient dialysis facility that [Fresenius] might build in Westerville, Ohio in the next 20 years, and to be Medical Director of such facility.

3

> 4. [Fresenius] agrees to partner with [NHS] to form a joint venture to develop, own and operate an outpatient dialysis facility in the Delaware, Ohio, the operations of which shall be consistent with [Fresenius's] Joint Venture Policy. [NHS] would be Medical Director of such facility. This transaction shall also be memorialized in a separate letter of intent.
>
> It is understood that *this letter merely constitutes a statement of the mutual intentions of the parties with respect to the matters outlined herein*, does not contain all matters upon which agreement must be reached in order for the proposed transactions outlined herein to be consummated and *creates no binding rights in favor of any party*. A binding commitment with respect to the proposed transactions will result only if definitive agreements are executed and delivered, and then, only subject to the terms and conditions contained therein.

(Am. Compl. Ex. E (emphasis added).)

Consistent with the Settlement Agreement, Fresenius paid NHS the sum of $500,000, and, until this suit was filed, NHS had asserted no claims against RCG or Fresenius regarding the Medical Director Agreement. (Am. Compl. ¶¶ 23, 24.)

Shortly after the execution of the Settlement Agreement, NHS notified Fresenius that it wanted to purchase a 20% interest in the Fresenius Clinic. (Am. Compl. ¶ 26.) According to Plaintiff, however, Fresenius "fail[ed] to negotiate with NHS in good faith" for this transaction. (*Id.* at ¶ 27.)

Following the execution of the Settlement Agreement, NHS and Fresenius jointly developed and established a dialysis clinic in Delaware, Ohio (the "Delaware Clinic"). NHS has been the Medical Director of the Delaware Clinic since it opened in June of 2008. Plaintiff alleges that as part of the Delaware Clinic's development, establishment, and operation, "definitive agreements for its operation were prepared, executed, and performed,[1] and Fresenius and NHS agreed that NHS would have the right to purchase, and Fresenius the obligation to sell, a 40% interest in the Delaware Clinic at fair market value." (Am. Compl. ¶¶ 30–31.) Plaintiff

---

[1] The record contains no documentation of these agreements.

4

further alleges that, in reliance upon Fresenius' promise to sell such 40% interest, "NHS devoted substantial time and resources to [its] development, establishment, and operation . . . and rejected proposals by competitors of Fresenius to partner with NHS to develop and operate outpatient dialysis clinics in Delaware, Ohio." (*Id.* at ¶ 32.) Plaintiff alleges that Fresenius "failed and refused to sell NHS a 40% interest in the Delaware Clinic at a price equaling its fair market value." (*Id.* at ¶ 34.)

Plaintiff's Amended Complaint asserts three counts, alleging that Defendant Fresenius (1) breached the Settlement Agreement by failing to sell a 20% interest in the Fresenius Clinic, (2) breached the parties' related agreement for the sale of a 40% interest in the Delaware Clinic, and (3) tortiously interfered with Plaintiff NHS's contracts and business relationship with CARA for the ownership and operation of the Columbus Renal Clinic (Am. Compl. ¶¶ 37–39).

## II. Standard of Review

Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6), which requires dismissal if the complaint fails to state a claim upon which relief can be granted. While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Furthermore, "[a]lthough for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it] [is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*, 129 S. Ct. at 1949–50 (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

5

## III. Count One: The Fresenius Clinic

As noted above, the Settlement Agreement provides:

> [Fresenius] shall permit [NHS] to purchase, at fair market value, a 20 percent interest in the Fresenius Clinic. . . . If [NHS] wish[es] to purchase such interest, [Fresenius] shall prepare a separate letter of intent regarding the formation of a joint venture to operate the Fresenius Clinic, which operation shall be consistent with [Fresenius's] Joint Venture Policy.

(Am. Compl. Ex. E.) Plaintiff alleges that, after NHS had notified Fresenius that it wanted to purchase a 20% interest in the Fresenius Clinic, Fresenius breached the Settlement Agreement by failing to negotiate in good faith for this transaction. (*Id.* at ¶¶ 26, 27.) Defendant contends that the Settlement Agreement is not binding, however, pointing to the following language:

> It is understood that *this letter merely constitutes a statement of the mutual intentions of the parties with respect to the matters outlined herein*, does not contain all matters upon which agreement must be reached in order for the proposed transactions outlined herein to be consummated and *creates no binding rights in favor of any party*. A binding commitment with respect to the proposed transactions will result only if definitive agreements are executed and delivered, and then, only subject to the terms and conditions contained therein.

(Am. Compl. Ex. E (emphasis added).)

Plaintiff asserts that the Settlement Agreement constituted a binding "agreement to agree" under Ohio law. "'The enforceability of [an agreement to make an agreement] depends . . . on whether the parties have manifested an intention to be bound by its terms and whether these intentions are sufficiently definite to be specifically enforced.'" *M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203, 208 (Ohio 1994) (quoting *Normandy Place Assoc. v. Beyer*, 443 N.E.2d 161, 164 (Ohio 1982) (superseded on other grounds)). "[W]hether the parties intended a contract is a factual [question], not a legal one," "must be based upon an evaluation of the circumstances surrounding the parties' discussions," and, "except in the clearest cases, the question is for the finder of fact to resolve." *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*,

6

541 F.2d 584, 588 (6th Cir. 1976) (citations omitted); *Normandy Place*, 443 N.E.2d at 164 (citing *Arnold Palmer*, 541 F.2d at 588). "The introduction of extrinsic evidence does not violate the parole evidence rule because that rule applies only after an integrated or a partially integrated agreement has been found." *Arnold Palmer*, 541 F.2d at 588.

Where a letter of intent "clearly indicate[d] that that document was nothing more than an agreement to principles which were subject to further negotiation" and "did not address all the essential terms of the merger," the Ohio Supreme Court has found that the letter was "not a legally enforceable contract." *M.J. DiCorpo*, 634 N.E.2d at 208. In a breach of contract case involving complex facts and issues, however, whether the parties intended to be bound is a question for the fact finder. *Arnold Palmer*, 541 F.2d at 588 (citing *S. J. Groves & Sons Co. v. Ohio Turnpike Comm'n*, 315 F.2d 235 (6th Cir. 1963)). The Court finds that this is such a case.

Defendant concedes: "[o]f course, *the parties are bound by the Settlement Agreement*, and Fresenius undisputably complied with *its obligation* to pay Dr. Sobel $500,000 in exchange for a release of all claims." (Def.'s Reply 4 (emphasis added).) Defendant contends that only the "provisions with regard to the proposed . . . dialysis facility transactions" were non-binding, explaining that parties to a contract can agree that certain terms "are binding" while others "create no binding rights." (*Id.* at 4–5.) While parties can so agree, it is far from clear that they did so here. The Settlement Agreement states that it "merely constitutes a statement of the mutual intentions of the parties with respect to the matters outlined herein . . . and creates no binding rights in favor of any party." (Am. Compl. Ex. E.) This language suggests that the Settlement Agreement contains *no* binding provisions, but this interpretation is inconsistent with both Defendant's concession that certain terms are binding and the parties' actions in partially performing the contract. It is undisputed that the parties partially performed the contract:

7

Fresenius paid NHS the sum of $500,000, the parties jointly developed and established the Delaware Clinic, and NHS has served as the Medical Director of that clinic. Under the standard set forth in *Arnold Palmer*, 541 F.2d at 588, the Court finds that this is not one of "the clearest cases," and it is a question of fact whether the parties intended to be bound.

Assuming for the purpose of this motion that the parties intended to be bound by an agreement to agree, such an agreement implies that the parties will negotiate in good faith. *See Savedoff v. Access Group, Inc.*, 524 F.3d 754, 764 (6th Cir. 2008) (holding that the duty of good faith depends upon the contract language, "which leads to an evaluation of reasonable expectations of the parties") (quotations omitted) (applying Ohio law); *Willow Park Convalescent Home v. Crestmont Cleveland P'ship*, 2003 Ohio 172, P48 (Ohio Ct. App. Jan. 16, 2003) (holding that "[a]n 'agreement to agree' . . . implies that the parties will negotiate in good faith) (citing Ohio Rev. Code § 1301.09). Defendant cites an Ohio appellate decision stating that parties have no duty to negotiate in good faith "when there is no evidence of a binding contract." (Mot. 15 (citing *Morganstern, Macadams & Devito Co., L.P.A. v. Hilliard Bldg. P'ship*, 2001 Ohio 4258 (Ohio Ct. App. Dec. 13, 2001).) Here, however, the parties' conduct constitutes evidence of a binding contract, and it is a question of fact whether the parties had a binding agreement to agree. If the parties had such an agreement, that agreement implies a duty to negotiate in good faith.

Defendant also contends that Plaintiff cannot show recoverable damages, a necessary element for a breach of contract claim under Ohio law. *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("To establish a breach of contract claim in Ohio, a plaintiff must prove . . . the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.") (quotations omitted). In support of its contention, Defendant

8

cites cases applying New York law for the proposition that a party cannot recover expectation damages for the breach of a duty to negotiate in good faith—because such a recovery "would convert the duty to negotiate in good faith into a duty to enter into an agreement." (Mot. 17–18.) In other words, it would assume that the parties had an agreement to agree—which this Court has already found is a question of fact that cannot be resolved on a motion under Rule 12(b)(6). Because Ohio law allows recovery of damages for the breach of an agreement to agree, the Court cannot agree with Defendant on this issue.

Accepting as true Plaintiff's allegation that Defendant failed to negotiate in good faith, the Court finds that Plaintiff states a plausible claim as to Count One. The Court therefore **DENIES** Defendant's motion as to that claim.

## IV. Count Two: The Delaware Clinic

As noted above, the Settlement Agreement provides:

> [Fresenius] agrees to partner with [NHS] to form a joint venture to develop, own and operate an outpatient dialysis facility in the Delaware, Ohio, the operations of which shall be consistent with [Fresenius's] Joint Venture Policy. [NHS] would be Medical Director of such facility. This transaction shall also be memorialized in a separate letter of intent.

(Am. Compl. Ex. E.) Plaintiff alleges that, consistent with the Settlement Agreement, NHS and Fresenius jointly developed and established the Delaware Clinic; prepared, executed, and performed agreements for its operation; and agreed that NHS would have the right to purchase, and Fresenius the obligation to sell, a 40% interest in the Delaware Clinic at fair market value. (*Id.* at ¶ 31.) Plaintiff further alleges that "[i]n reliance upon Fresenius' promise to sell NHS a 40% interest in the Delaware Clinic at fair market value, NHS devoted substantial time and resources to the development, establishment, and operation of the Delaware Clinic and rejected proposals by competitors of Fresenius to partner with NHS to develop and operate outpatient

9

dialysis clinics in Delaware, Ohio." (*Id.* at ¶ 32.) According to Plaintiff, Fresenius then "failed and refused to sell NHS a 40% interest in the Delaware Clinic at a price equaling its fair market value." (*Id.* at ¶ 34.)

As its sole basis for seeking dismissal of this claim, Defendant asserts that a claim for promissory estoppel[2] will not lie where a written contract covers the subject matter of the alleged promise. (Mot. 19 (citing *Kashif v. Central State Univ.*, 729 N.E.2d 787, 791–92 (Ohio Ct. App. June 3, 1999).) Plaintiff does not allege that the Settlement Agreement or any other written contract contains this promise, however. Rather, the Amended Complaint alleges that Plaintiff and Fresenius agreed on the purchase and sale after having executed the Settlement Agreement. Defendant makes no argument regarding a potential breach of contract claim based on an agreement made after the execution of the Settlement Agreement.

The Court finds that Plaintiff alleges sufficient facts to set forth a plausible claim and **DENIES** Defendant's motion as to Claim Two.

## V. Count Three: Tortious Interference

Plaintiff alleges that Fresenius "intentionally and maliciously prevented CARA and Columbus Renal from opening the Columbus Renal Clinic" and thereby "prevented them from performing and caused them to repudiate and breach their agreements with NHS, including the Medical Director Agreement" in order to benefit that clinic's would-be competitor, the Fresenius Clinic. (Am. Compl. ¶¶ 13, 14.)

---

[2] Under Ohio's promissory estoppel doctrine, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *McCroskey v. State*, 8 Ohio St. 3d 29, 30 (Ohio 1983) (adopting Restatement (2d) of Contracts § 90 (1973)). To establish a claim of promissory estoppel under Ohio law, a plaintiff must prove: (1) a clear and unambiguous promise, (2) reliance on the promise by the party to whom the promise is made, (3) that the reliance was reasonable and foreseeable, and (4) that the party claiming estoppel was injured by the reliance. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 503 (6th Cir. 2003) (citing *Rigby v. Fallsway Equip. Co., Inc.*, 779 N.E.2d 1056, 1061 (Ohio Ct. App. Nov. 13, 2002); *Connolly v. Malkamaki*, 2002 Ohio 6933 (Ohio Ct. App. Dec. 13, 2002)).

10

"Under Ohio law, 'one who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract' commits tortious interference with contract." *Vitek v. AIG Life Brokerage*, No. 06-cv-615, 2008 U.S. Dist. Lexis 82132, *28 (S.D. Ohio Sept. 22, 2008) (quoting *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995)). Because "it is no tort [under Ohio law] to breach a contract, regardless of motive," however, "a party to a contract cannot be liable in tort for inducing his own breach." *Id.*, 2008 U.S. Dist. Lexis 82132 at *28–29 (quoting *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 602 (6th Cir. 1988); citing *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 116 (6th Cir. 1976)). Moreover, because a parent company is, "in effect, the same entity as [its subsidiary]," it is "privileged to become involved in the relations between [the subsidiary and a third party]." *Canderm*, 862 F.2d at 601; *Vitek*, 2008 U.S. Dist. Lexis 82132 at *29.

Plaintiff asserts that a parent corporation is privileged to interfere with its subsidiary's contracts only to protect the subsidiary's economic interests, and not to protect its own unrelated interests. (Pl.'s Mem. 15–16.) Aside from cases interpreting Missouri, Kansas, Arkansas, Georgia, and Tennessee law, Plaintiff cites *Speroni S.P.A. v. Perceptron, Inc.*, 12 Fed. Appx. 355 (6th Cir. 2001). In *Speroni*, a panel of the Sixth Circuit, applying Michigan law, found that the plaintiff had not stated a claim for contractual interference where it had not alleged that the parent company's interference was not in the subsidiary's interest. *Speroni*, 12 Fed. Appx. at 360–61. The Court stated that its holding was consistent with *Canderm*. *Id.*, 12 Fed. Appx. at 360. In *Canderm*, however, "the undisputed motivation" for the parent company's cancellation of the contract between its subsidiary and the plaintiff was to benefit the parent company's *other* subsidiary, which was in direct competition with the plaintiff—a situation substantially mirroring

11

the one in this case. *Canderm*, 862 F.2d at 599. Because the Court in *Speroni* did not apply Ohio law, this Court need not reconcile it with the Sixth Circuit's clear holding in *Canderm*.

Plaintiff also cites a Sixth Circuit case applying Tennessee law for the proposition that a parent company which owns a majority, but less than 100%, of a subsidiary company does not enjoy a privilege to interfere with the subsidiary's contracts. (Pl.'s Mem. 15 n.3 (citing *Cambio Health Solutions, LLC v. Reardon*, 234 Fed. Appx. 331 (6th Cir. 2007)).) Plaintiff points out that the Amended Complaint does not specifically allege that Fresenius directly or indirectly owns 100% of CARA; it alleges merely that Fresenius (through RCG) owns "more than a majority ownership interest." (Am. Compl. ¶ 6.) The Court's review of Ohio case law finds no support in such an exception to the rule of a parent company's privilege, however.

Because Fresenius is CARA's parent company, Fresenius was privileged under Ohio law to interfere with CARA's contract with Plaintiff. Count Three is therefore **DISMISSED**.

## VI. Conclusion

For the reasons discussed above, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss Plaintiff's Amended Complaint. (Doc. 18.) Count Three is hereby **DISMISSED**. The Court further **ORDERS** that Defendant's Motion to Dismiss Plaintiff's Complaint (Doc. 9) is hereby **DENIED** as moot.

**IT IS SO ORDERED.**

_____8-5-2010_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

12